**BURSOR & FISHER, P.A.**
Neal J. Deckant (State Bar No. 322946)
Luke Sironski-White (State Bar No. 348441)
Ryan B. Martin (State Bar No. 359876)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ndeckant@bursor.com
        lsironski@bursor.com
        rmartin@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIN JENNINGS, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| SHAMAN BOTANICALS, LLC D/B/A SOMA KRATOM, and CBD AMERICAN SHAMAN, LLC D/B/A SOMA KRATOM, | <u>JURY TRIAL DEMANDED</u> |
| Defendants. | |

Plaintiff Erin Jennings ("Plaintiff") brings this action on behalf of herself and all others similarly situated against Shaman Botanicals, LLC d/b/a Soma Kratom and CBD American Shaman, LLC d/b/a Soma Kratom ("Defendants" or "Soma").

## NATURE OF THE ACTION

1.      This is a civil class action lawsuit against Defendants for false, misleading, deceptive, and negligent sales practices regarding their kratom shot products[1] (the "Products"). Kratom is a type of plant indigenous to Southeast Asia which can produce psychoactive effects when ingested.  Dried kratom leaves are sold as a loose powder, packaged into gel capsules, or made into an extract.  However, what reasonable consumers do not know, and Defendants fail to disclose, is that the "active ingredients" in kratom are similar to opioids.  That is, kratom works on the exact same opioid receptors in the human brain as morphine and its analogs, has similar effects as such, and critically, has the same risk of physical addiction and dependency, with similar withdrawal symptoms.

2.      When reasonable consumers think of opiates and opioids, they think of heroin, fentanyl, hydrocodone, oxycodone, and morphine; they do not expect that the "all natural" product bought at their local corner store operates like an opioid, with similar addiction and dependency risks.  Kratom is perniciously addictive—on a whole different level than caffeine or nicotine—and it has sunk its hooks into tens of thousands of unsuspecting consumers and caused them serious physical, psychological, and financial harm.  Defendants intentionally and negligently failed to disclose these material facts anywhere on their labeling, packaging, or marketing materials, and have violated warranty law and state consumer protection statutes in the process.

3.      Defendants rely on their Products' innocuous packaging and the public's limited knowledge about kratom and its pharmacology to get users addicted, while reaping profits along the way.  Reasonable consumers do not expect the liquid extract bottles which they can purchase at gas stations and corner stores, to perform like an opioid with the same addictive potential of

---

[1] The Products include any and all Soma Kratom products, including "Soma 100," "Soma 200," "Soma 300," and all other kratom products produced, manufactured, sold, or distributed by Defendants.

morphine and its analogs.  Defendants rely on this ignorance and do nothing to correct it.  Such activity is outrageous and is in contravention of California law and public policy.

4.     Defendants have engaged in a systemic effort to peddle an addictive substance to unsuspecting and oftentimes vulnerable consumers.  Plaintiff seeks relief in this action individually, and as a class action on behalf of similarly situated purchasers of Defendants' Products, for: (i) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq*.; (ii) violation of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civil Code § 1750, *et seq*.; (iii) violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, *et seq*.; (iv) breach of implied warranty; (v) unjust enrichment; and (vi) fraud by omission.

## PARTIES

5.     Plaintiff Erin Jennings is a citizen of California who resides in Grass Valley, California and intends to stay there.  Plaintiff Jennings first purchased the Products in or around March 2024.  Plaintiff Jennings had struggled with anxiety most of her life.  One day, a friend of hers brought over one of the Products and told her that it would help relieve her anxiety.  Plaintiff Jennings was assured that the Products were <u>not</u> addictive.  Plaintiff Jennings also reviewed the packaging and concluded that a Product that is addictive would have a warning on the packaging and because the Product did not have such a warning that it must not be addictive.  As such, the first time Plaintiff Jennings tried the Product she was amazed that such a Product could produce such effects without being addictive, so she came back for more.  Plaintiff Jennings started with using the Products sparingly but quickly her tolerance grew.  This continued until 6 months later when Plaintiff Jennings realized how much money she was spending on the Products and tried to quit.  Plaintiff Jennings then experienced severe withdrawals when trying to quit including depression, anxiety, sweats, chills, diarrhea, nausea, vomiting, and restless legs.  This was the moment Plaintiff Jennings realized Defendants did not tell the truth about the Products, and that she had become addicted to them.  Plaintiff Jennings could not believe that something without a warning could wreak this havoc on her life and her finances.  Plaintiff Jennings has been unable to

this day to stop using the Products despite wanting to. Had she known that the Products are highly addictive, by way of a warning on the Products' packaging, she would have never purchased it.

6.     CBD American Shaman, LLC is a Missouri limited liability company with its registered address located in Kansas City, Missouri. CBD American Shaman, LLC markets sells and distributes the Products throughout the United States, including in California. CBD American Shaman, LLC manufactured, marketed, and sold the Products at issue at all times during the relevant Class Period.

7.     Shaman Botanicals, LLC is a Missouri limited liability company with its registered address located in Kansas City, Missouri. Shaman Botanicals, LLC markets sells and distributes the Products throughout the United States, including in California. Shaman Botanicals, LLC manufactured, marketed, and sold the Products at issue at all times during the relevant Class Period.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from one Defendant.

9.     This Court has personal jurisdiction over the parties because Plaintiff resides in California, is a citizen of California, and submits to the jurisdiction of the Court, and because Defendants have, at all times relevant hereto, systematically and continually conducted, and continue to conduct, business in this District. Defendants therefore have sufficient minimum contacts with this state, including within this District, and/or intentionally availed themselves of the benefits and privileges of the California consumer market through the promotion, marketing, and sale of their Products to residents within this District and throughout this State. Additionally, Defendants marketed and sold the Products to Plaintiff in this District.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants regularly do business in this District and the same misrepresentations, omissions, and injures

giving rise to the claims alleged herein have occurred in this District (e.g., the distribution and sale of Kratom to Plaintiff, and Plaintiff's subsequent addiction to kratom).

**FACTUAL ALLEGATIONS**

**A.      Background and Pharmacology of Kratom**

11.      "Kratom" refers to the substance derived from the leaves of a tropical tree, *mitragyna speciosa* (the "kratom plant"), indigenous to Southeast Asia, where it has been used in herbal medicine since the 19th Century.  Kratom's first reported use in scientific literature was in 1836, when it was noted that Malays used kratom tree leaves as a substitute for opium.  Historic use of the kratom plant was particularly well-documented in Thailand, Indonesia, and Malaysia, where kratom remains popular to this day.

12.      Kratom is the most widely used drug in Thailand.  This popularity does not mean Thailand believes kratom is harmless.  To the contrary, Thailand understands that kratom is dangerous, as demonstrated by its ban of the substance in 1943.[2]  Kratom was also historically popular in Malaysia until it was banned in 1952 under the Poisons Act.

13.      Kratom's varying, dose-dependent, effects have historically been part of its appeal. For instance, the earliest accounts of kratom characterize kratom use for both a stimulant effect during hard day-labor by chewing fresh kratom leaves, and also as an analgesic or for relaxation by brewing kratom into a tea.

14.      In the Western world, kratom is sold online and at herbal stores, gas stations, corner stores, smoke shops, and "head" shops where it is primarily marketed as an herbal medicine or natural supplement to use to "treat" a variety of ailments (e.g., pain, mental health, opioid withdrawal symptoms), and/or to obtain a "legal" or "natural" high.

---

[2] In 1943, Thailand banned the possession, use, and propagation of kratom, and later banned all kratom sales, imports, exports, and consumption all together.  However, in 2021, Thailand decriminalized possession of kratom in response to a growing pressure on its justice system to fix the country's overcrowded prisons through liberalization of its drug laws.

15.     To create consumable kratom products, kratom plant leaves are harvested, dried, and crushed into a fine powder that is then packaged and sold in pouches, capsules, or liquid formulations.[3]

16.     The chemicals in the kratom plant which produce a psychoactive effect when ingested are called "alkaloids."  "Alkaloids" are a class of various naturally occurring organic chemical compounds.  The primary alkaloids in kratom leaves responsible for kratom's effects are mitragynine ("MG") and 7-hydroxymitragynine ("7-OH").

17.     MG and 7-OH produce a wide spectrum of effects because they interact with many different receptors in the brain.  Studies show that MG and 7-OH interact with alpha-2 adrenergic receptors (adrenaline), D2 dopamine receptors, and the serotonin receptors (5-HT2A and 5-HT2C), all of which contribute to kratom's mood-lifting and stimulant-like effects.

18.     Most crucially, MG and 7-OH interact with the mu-opioid receptor.  The mu-opioid receptor produces the most addictive or habit-forming effects, such as euphoria and analgesia.  For this reason, the mu-opioid receptor is known as "the gateway to addiction" because it is the receptor which all opioids interact with to produce the classic opioid high feelings of euphoria, sedation, and pain relief.

19.     MG and 7-OH cause a variety of pharmacological effects depending on their potency, resulting in a highly dose-dependent response to each kratom product.  For example, a low dose (0.5 grams to 3 grams) is typically described as stimulating or energizing, whereas a high dose (3+ grams) is typically described as euphoric, sedating, and analgesic.  Nonetheless, in sufficient doses, kratom's effects are substantially similar to those of opioids and other drugs.

20.     Accordingly, kratom is referred to as a "quasi-opiate" by health professionals because of its opioid-like characteristics.  This concept that kratom is essentially an opioid is affirmed by several facts: first, as discussed above, kratom's effects are substantially similar to those of opioids; second, kratom alleviates opioid withdraw symptoms; and third, repeated use of kratom causes opioid withdrawal symptoms.

---

[3] When kratom leaves are extracted into a liquid formulation, this is colloquially called a kratom "extract shot."

21.     Opioids are addictive not only because of the pleasurable effects that they produce, but also because sudden cessation of opioid use causes severe withdrawal symptoms which users feel compelled to avoid by taking more of the drug.  The tragedy of addiction is that users want to stop but cannot.

22.     All substances that act on the opioid receptors carry a high risk of addiction, and kratom is no exception.  Addiction occurs when an opioid is ingested on a regular basis and, over time, the user develops a tolerance to the drug that requires the user to consume an increased dose of the drug to achieve the same effects a lower dose previously had.  As these doses increase, the body becomes dependent on the drug to feel normal and function properly.  When the drug is suddenly taken away or the user tries to stop taking the drug, withdrawal occurs.  Withdrawal symptoms cause the user to feel much worse than they did before they started taking the drug and can be extremely painful and intolerable to the user.

23.     Indeed, kratom withdrawal symptoms are very similar to those of traditional opioid withdrawal.  These symptoms include irritability, anxiety, difficulty concentrating, depression, sleep disturbance, including restless legs, tearing up, runny nose, muscle and bone pain, muscle spasms, diarrhea, decreased appetite, chills, inability to control temperature, extreme dysphoria, and malaise.

24.     Users typically start substances like kratom because of how good it makes them feel, but once addicted, they use kratom to avoid the pain and sickness of withdrawal.  Use is no longer is about getting high, but about not feeling "sick."

25.     Kratom users state that kratom addiction is unique in the way it sneaks up on them. What is particularly insidious about kratom, they describe, is that because they are unaware of kratom's negative side effects and its addictive potential, when they begin to experience the negative symptoms attributable to addiction in the early stages of taking kratom products, they do not attribute it to the kratom.  Instead, kratom users then take more kratom believing the kratom companies' claims that kratom will help them feel better.

26.     Long-term kratom users further report experiencing depression, anxiety, anhedonia, and reduced sex drive due to their kratom use.

**B.    Kratom Use and Addiction in the United States**

27.    Kratom use in the United States has exploded over the past decade.  As of 2023, the American Kratom Association estimates that kratom is a 1.5 billion dollar a year industry, with 11-15 million annual users in the United States, up from 3-5 million users in 2016.

28.    Kratom's popularity is attributed to several factors: first, kratom is marketed as a safe substitute for painkillers and so it appeals to consumers who falsely equate "natural" with "safe;" second, kratom has received media attention as a "nootropic" or "smart" drug because it is stimulating at low doses; third, kratom is widely available and unregulated within the United States; fourth, it produces a "pleasurable" high; and lastly, users are unaware of kratom's opioid-like characteristics, addiction, and withdrawal potential.

29.    However, kratom is still generally a relatively unknown substance to the average consumer, and most people have never heard of it.  Kratom sellers advertise that it is a substitute for coffee, a pain reliever, a treatment for opioid withdrawal, an antidepressant, an anti-anxiety supplement, and that it improves focus and gives users a boost of energy to get through the day. These kratom companies universally reiterate these purported "benefits" of kratom consumption, without disclosing any of the corresponding harms of kratom use.

30.    Further, because kratom does not produce as extreme of a "high" as cocaine or heroin, it is easy for users to take kratom daily without realizing they are developing an addiction and harming themselves.  This makes kratom particularly insidious as addiction sneaks up on unsuspecting and uninformed users.

31.    As a result of kratom manufacturers, retailers, and advertisers failing to warn consumers of kratom's addictive potential, many kratom users find themselves blindsided when they stop taking kratom and find themselves facing severe withdrawal symptoms after having stopped using what they thought was a harmless supplement.  Further, because kratom is relatively unknown in the United States, there are not well-established recovery resources for addicted users to turn to for resources and aid.  Some kratom users turn to the Internet for support, and there are well-populated and very active Internet forum support groups for consumers struggling with, and recovering from, kratom addictions.

32.     The reports from addicted kratom users are heart-wrenching. Consistent among these reports is a feeling of initial shock when users realized they had become unknowingly addicted to kratom, and how difficult it was to stop their kratom use. Below are several accounts from the "Quitting Kratom" forum on www.reddit.com, which has over 45,000 members as of October 2024:[4]

One user wrote: "I've been on a 50gpd [grams per day] habit for about 4 years.  Like most people here, **I was in denial that the Kratom was causing my multitude of issues. How could it be the Kratom when everyone keeps telling me how great it is?**  I made myself believe that I had underlying issues that the Kratom was helping.  Spoiler: It wasn't.  **I slowly became a shell of the person I used to be. TRUE clinical depression symptoms with zero joy in my life.**  I started browsing this subreddit and reading everyone's stories and I related to every single one.  **Everyone had the same exact experience I had and at that moment I knew it was the Kratom causing my depression.**" (emphasis added).

A gas station employee wrote: "I work at a gas station where we sell kratom such as powders, gold and silver pills and especially shots etc (you know which one I'm talking about) **it's just mind blowing to me how many people are practically addicted and how many customers literally scavenge their money to pay for their daily shot.**  Why are people so addicted especially to those shots."

Another user solicited "extract horror stories" – one user responded: "Took 2-3 shots a day for almost 2 years.  How did it screw me up?  Let me count the ways.  Financially it was draining me, 100%! **I would estimate 60% of my hair fell out. My skin was grey.  My eyes were dark.  I became a hermit.**  No longer wanted to do anything, including self care or hygiene.  Just taking a shower was a chore I had to talk myself into the last few months.  I was disgusting and did not care at all. **All I cared about was that I had enough K for tomorrow.**"

In response to the same "extract horror stories" post, another user responded: "I used [kratom extract] pills and sometimes the shots for over 5 years.  I'm now 290 days clean from them. **They were so hard to kick bc of how addicting they are.**  And you can just walk in the store and buy them.  I was spending $45 day on this stuff.  **I wasted tens of thousands of dollars on it and my life suffered.**  Lots of my hair fell out and it's only now starting to grow back some, I think most of it is gone for good.  I'm repairing my marriage and friendships.  Everything.  Stay away from this stuff."

Another user responded: "Amen.  This shit got hold of me as bad as anything else I've ever done... spent WAY more money on these fucking things than real honest to God hard drugs back in the day. **Anywhere from 6-10 of these things daily for...**

---

[4] *See* https://www.reddit.com/r/quittingkratom.

**years. Let's call it 7 at an average of $18/pop = $126/day x 30 = $3780/month = about $45k/year.** How fucking embarrassing.  I made $140,000 last year living in Georgia (pretty low cost of living) and pretty regularly get busted "borrowing" money from my 10 year old son.  Fuck this; I'm not living like this anymore."

About 2 years ago, another user wrote: "I saw 'A Leaf of Faith' and got the impression that kratom was a generally friendly substance to use freely, never knowing how addictive it was, how much it was further numbing me beyond how alcohol already was, how it was slowly wiping out my sex drive, and likely contributing to my perpetual brain fog. … My second attempt [at quitting] was maybe another 7 or 8 months later.  Kratom was making me pretty miserable. I was reading posts in this subreddit and I was finally aware of how addicted I was; feeling crappy, sluggish, and sorta spacey pretty much all the time."

About 2 years ago, another user wrote: "What a difficult journey it has been.  I was a ~75 GPD [grams per day] user.  **Quitting kratom was one of the hardest things I've had to do in my life.**  I learned the hard way that kratom causes withdrawals on a work trip 3 years ago.  I should have stopped then and there but I gave in because the RLS was so bad. … **Kratom withdrawal is seriously no joke so don't think you're the only one struggling so much.**  I'm only a week free but after this experience I know for sure that I will never go back.  Good luck everyone!" (emphasis added).

About 2 years ago, another user wrote a post titled *Kratom Is An Addictive Drug*.  It said, in part: "It's been 23 hours since my last dose.  **I just wanted to give my story hoping that it would help others see that they've been lied to, deceived and manipulated into thinking this plant is 'harmless and safe'.**  As a matter of fact, reading the horror stories on this subreddit was the first step in my recovery... I started taking it almost 3 years ago after hearing about it on... well, Reddit.  They touted it is a miracle plant that had all the benefits of an opioid with none of the side effects." (emphasis added).

About 19 months ago, another user wrote: "**I think the perfect word to describe Kratom addiction is 'insidious'.**  Here is the definition – *'proceeding in a gradual, subtle way, but with harmful effects.'*  I think this is why it takes so long to realize what is going on.  There was never a rock bottom moment for me like there would be for other more conventional abused drugs.  No overdose, no bad behavior, no abusiveness to my family, no DWI, etc.. - It was just a lazy, slow descent into nothingness. I was living in a groundhogs day type of existence.  Wake up, go to work, leave work, buy an extract shot or 2, have dinner, drink my shot, mindlessly look at my phone and/or watch TV.  Wake up and do it all over again." (italic emphasis in original, bold emphasis added).

About 12 months ago, another user wrote: "I started using k[ratom] when I had knee surgery Dec 2019 so 3 years.  **I didn't want to use pain killers because I got sober from alcohol 3/6/2018 and i felt the pain killers were going to make me relapse.**  I didn't know I would end up in a worst place as I am now." (emphasis added).

About 2 years ago, another user wrote: "Was in bed all day yesterday fighting withdrawals.  I used to even be an athlete - strong lean and fit, until I got on [kratom] shots and extracts.  Didn't even get high any more - just wanted to not feel bad."

About 4 years ago, another user wrote: "I researched kratom before using it and almost every site promoted that its harmless with healthy benefits, and that its withdrawals are like coffee for 3 days max. Information wasn't clear that kratom could become a negative addiction that takes months to recover" … "**I took something I thought was helping me for 1.5-2 years, not even knowing the downsides bc that information was so misleading. It fucked up my digestion, energy, mood, brain fog, anxiety, etc.  Fuck kratom, and fuck those who peddle it as a harmless cure-all**." (emphasis added)

About 10 months ago, another user wrote: "For any newcomers: this stuff is absolutely no joke.  It's not harmless and the wd [withdrawal] is *definitely* **not** like caffeine.  I've cold turkey'd caffeine before and I had a slight headache for a couple hours.  I definitely have never woken up in a pool of my own sweat from not having my caffeine. … **This stuff is a drug.  A serious drug.  And it's super freakin addictive**.  *Extracts, powder, or in my case, capsules…it doesn't matter*.  Yes some forms are more addictive than others but the WD is hellacious no matter how you're taking it." (emphasis added)

About 10 months ago, another user wrote: "This stuff is a drug, and dangerous!  **I started taking it because of all the good things I heard and read about it**.  I've never been addicted to or dependent on anything before, but this stuff has totally taken control of my life." (emphasis added)

About 9 months ago, another user wrote: "I finally realized a few weeks ago how much of a negative impact kratom was having on my life.  I noticed myself planning my whole day around my doses and making sure when I left the house I'd bring an extra dose with me in a shaker bottle.  It was heavily affecting my mood overall, but especially in public settings.  I did not want to leave my house most days even if I did dose."

About 9 months ago, another user wrote: "I have been taking OPMS black pills for about a year now.  It has ran my bank dry.  When I wake up in the morning I fucking crave this shit.  I have never been addicted to opiates or anything like that.  I get to the point where I am going to go cold turkey and am so confident but when I wake up my brain makes me think its okay to go get it.  I cant talk to anyone about this in my family or friends.  I have a very high stress job and am also going through a nasty break up.  I feel so alone with trying to stop and when I betray myself and go to get more, i fight back tears in the parking lot (I am a grown ass man).  I am not an emotional person and in my environment theres no room for emotions.  Should I tapper off?  What the fuck do I do?"

About 3 months ago, another user wrote: "I was taking one to two opms gold shots a day (sometimes three) for about two years straight.  When the 24hr mark hit the withdrawals kicked in hard.  I had become absolutely obsessed with scavenging 20$ togther to make sure I got my shot each day.  Constantly driving to the shop, hoping no one would see me pop out.  I wanted to quit every night but just couldn't stand the withdrawals.  I finally quit (on day 17 ct) with the help of a quit buddy I found in this sub.  I'm still not right at all, RLS is there and my sleep is still off.  I'm sneezing more than I ever have.  But, music is back, I have more money in my pocket and I feel free from the grips.  I've still got a long ways to go but am committed to never touching that shit again.  It brought out the worst version of me."

33.     This Internet forum is filled with accounts just like these.  The stories are consistent – well-meaning people who were looking to feel better, in mind body and spirit, by taking an "herbal supplement," only to end up with an opioid-like addiction.

34.     As these accounts make clear, the addictive potential of kratom is a material fact to reasonable consumers which would help inform their purchase and consumption decisions.  Defendants' Products have no warnings, whatsoever, that kratom is similar to an opioid, is habit-forming, and that regular use will result in opioid-like dependency with withdrawal symptoms similar to those of traditional opioids.

35.     Consumers who knew the truth about kratom would not have purchased Defendants' Products or would have paid less than they did for them.

**C.     Defendants Knew or Should Have Known They Were Selling a Highly Addictive Drug to Unsuspecting Consumers**

36.     Despite its traditional medical uses, kratom dependence has been known and observed for a long time and is well-documented in Southeast Asia, where the plaint originates and has the longest history of use.  Addiction to kratom among users in Thailand, Indonesia, and Malaysia has been documented by scientists and researchers in the United States since at least 1988.

37.     To reiterate, this is not an instance where scientific merit is still up for debate.  Western civilization has known for decades that kratom is highly addictive and has the potential to cause physical and psychological dependence in regular users.  In Southeast Asia, it has been known for over a century that kratom is addictive.  For example, a 2007 study found that 2.3% of

1  people in Thailand have used kratom, and that many of those users developed a dependence on

2  kratom to avoid withdrawal.

3    38. However, the fact that kratom's addictive potential has been known in the *scientific*

4  *community*, does not mean that the general public is aware of it. Indeed, most consumers do not

5  know what kratom is and have no idea how addictive it is.

6    39. Defendants operate under the brand name Soma Kratom and sell kratom shots in

7  varying intensities.



40. Defendants sell the Products online through somakratomdirect.com and other third

party retailers, as well as brick and mortar stores like gas stations and smoke shops. Defendants

also operate an advertising website, somakratom.com, that is used for wholesale orders.

  41. No matter what Product consumers take, however, they are exposed to significant

levels of addictive alkaloids.

  42. Upon information and belief, Defendants have interacted with growers and

distributors in Southeast Asia who have disclosed the addictive nature of kratom.

  43. Even without such interactions, Defendants have received numerous user reports

about the addictive potential of kratom in the United States.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED     12

44.    Defendants therefore knew or should have known that the Products were highly addictive.

45.    However, despite this knowledge, Defendants failed to disclose the addictive potential of the Products on their website or anywhere on the Products' packaging.

46.    Indeed they do the opposite.  Defendants specifically represent on somakratom.com that "[w]ithdrawl from Kratom dependency generally matches caffeine withdrawal" and is nothing like opioid withdrawal.[5]  Defendants portray the Products as a snake oil miracle supplement and inform consumers that kratom's "use is reported to benefit quality of life, and improve social and occupational behavior, with little evidence of serious personal or social harm."[6]  However, this is an outright lie and it belies Defendants knowledge and intent behind marketing and distributing the Products to consumers.

47.    Furthermore, Defendants give customers a wink and a nod that the Products have euphoric effects that bring "peace of mind and ease of body."  Customers who have experience with kratom may have a sense for what this means, but regular consumers do not.



Elevate your present moment with our Soma Kratom Elixir. Let your peace of mind and ease of body be restored throughout the day with each dose of our Soma Kratom signature line.

48.    By using phrases like "elevate your present moment," Defendants downplay the seriousness of the drug they are selling to consumers and instead attempts to conjure an impression of kratom as an all-natural pharmaceutical.  Such language is deceitful and harmful to consumers who rely on Defendants' Product statements when making their purchasing decisions Consumers who walk into their local smoke shop and see the Products and be enticed into purchasing them

---

[5] *What is Kratom*, SOMA, https://somakratom.com/about-kratom/ (last accessed Feb. 26, 2025).
[6] *Id.*

because they think they look inviting and if they were dangerous there would be a warning on the package.

49.     There is no warning to consumers that the Products interact with opioid receptors, nor is there any warning that the Products are highly addictive and should not be taken on a daily basis.

50.     Further, the packaging itself is innocuous.  The minimalistic design and pictures of leaves evokes a sense of connection to nature.  Nothing about this packaging would lead reasonable consumers to believe they were purchasing compounds similar to opioids, that act on the same mu-opioid receptors in the brain as opioids do.  Nor would the packaging lead reasonable consumers to presume that kratom is highly addictive.

Somakratomdirect.com, Defendants' website to sell the Products to customers online, is entirely devoid of statements about the Products.



51.     Addiction is a disease, a medical condition.  Thus, any product which carries an addiction risk poses a concurrent health hazard, which is a material fact to consumers. Accordingly, Defendants' Products carry the threat of an unreasonable health hazard which Defendants were obliged to disclose to consumers on the Products' packaging.

52.     Further, those seeking help as they come off opioids may be drawn in by Defendants' statements about kratom without knowing that they risk trading one addiction for another.  Defendants have an obligation not only to remove such harmful statements from their websites, but to warn consumers about the potential risks of taking kratom and to provide such a warning on the Products' labels.

53.     The consequences of kratom addiction are not mild: "in humans, opioid-like withdrawal symptoms have been reported following cessation of kratom use," though "the withdrawal syndrome appears to be less severe than withdrawal from morphine."

54.     While kratom withdrawal may be "less severe" than morphine withdrawal, that is hardly a seal of approval – morphine withdrawal is one of the most unpleasant experiences that one can endure in modern life.  And kratom withdrawal, while perhaps "less severe" than morphine withdrawal, is still an "opioid-like withdrawal" (according to the World Health Organization), with the same physical and mental symptoms.

55.     The risk of "opioid-like withdrawal symptoms" is a material fact to reasonable consumers.

56.     As a kratom product manufacturer and distributor, Defendants occupied a position of superior knowledge to the average reasonable consumer, who likely knows next to nothing about kratom.

57.     Defendants, through their misleading advertising and failure to disclose kratom's addictive properties on the Products' labels, relied upon the average consumer's incomplete knowledge of kratom to sell the Products and get users addicted to kratom.

58.     The very fact that Defendants possess the capability to manufacture these Products shows that they understand the pharmacokinetic nature of kratom and the substantial risk of

addiction that it poses to consumers. Despite this, Defendants markets the Products as if they are nothing more than over-the-counter energy or nootropic supplements.

59. Defendants fail to disclose kratom's addictive potential because Defendants know that it is a material fact to reasonable consumers which would influence their purchasing and consumption decisions, likely to Defendants' detriment.

60. By any metric, Defendants' conduct is immoral, unethical, and contrary to California public policy.

61. The United States is going through an opiate crisis that is shaking the foundations of our society. Amid this crisis, Defendants are creating more addicts for no reason other than to line their pockets, without adequate disclosures of the Products' risks and through the use of false and misleading packaging. That cannot – and should not – be allowed, at least when their conduct entails breaches of warranty and violation of state consumer protection statutes (as it does here).

## CLASS ALLEGATIONS

62. ***Class Definition***. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), on behalf of herself and all other similarly situated consumers, and seeks to represent a class (the "**Class**") defined as:

> All persons in the United States who, within the applicable statute of limitations period, up to and including the date of final judgment in this action, purchased Soma Kratom products.

63. Plaintiff also seeks to represent a subclass of all Class members who purchased Defendants' Products in California, within the applicable statutory period (the "**California Subclass,**" collectively, together with the **Class**, the "**Classes**").

64. Specifically excluded from the Classes are Defendants and any entities in which Defendants have a controlling interest, Defendants' agents and employees, the judge to whom this action is assigned, members of the judge's staff, and the judge's immediate family.

65. Plaintiff reserves the right to amend the definition of the Classes if discovery or further investigation reveals that the Classes should be expanded or otherwise modified.

66.     ***Numerosity.***  Members of the Classes are so numerous that their individual joinder herein is impracticable.  On information and belief, the Classes comprise of at least thousands of consumers throughout California and the United States.  The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendants.

67.     ***Commonality and Predominance***.  Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

    a.   whether the labels on Defendants' Products have the capacity to mislead reasonable consumers;

    b.   whether Defendants knew that kratom is a highly addictive substance;

    c.   whether Defendants had a duty to inform consumers about the risks inherent to consumption of the Products;

    d.   whether Defendants' conduct alleged herein violated California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, *et seq*., California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq.*, and / or California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*;

    e.   whether Defendants' conduct alleged herein constitutes unjust enrichment;

    f.   whether Defendants' conduct constitutes negligent omission;

    g.   whether Plaintiff and the Class are entitled to damages and/or restitution; and

    h.   whether Plaintiff and the Class are entitled to attorneys' fees and costs.

68.     ***Typicality.***  Plaintiff's claims are typical of the claims of the Class in that Plaintiff and the Class sustained damages as a result of Defendants' uniform wrongful conduct, based upon Defendants' failure to inform Plaintiff and all others similarly situated that its Products are highly addictive and operate similarly to opioids.

1    69.    **Adequacy**.  Plaintiff will fairly and adequately protect Class members' interests.

2    Plaintiff has no interests antagonistic to Class members' interests, and Plaintiff has retained counsel

3    that have considerable experience and success in prosecuting complex class-actions and consumer-

4    protection cases.

5    70.    **Superiority**.  A class action is superior to all other available methods for the fair and

6    efficient adjudication of this controversy for, *inter alia*, the following reasons: prosecutions of

7    individual actions are economically impractical for members of the Class; the Class is readily

8    definable; prosecution as a class action avoids repetitious litigation and duplicative litigation costs,

9    conserves judicial resources, and ensures uniformity of decisions; and prosecution as a class action

10   permits claims to be handled in an orderly and expeditious manner.

11   71.    Defendants have acted or failed to act on grounds generally applicable to the Class,

12   thereby making appropriate final injunctive relief with respect to the Class as a whole.

13   72.    Without a class action, Defendants will continue a course of action that will result in

14   further damages to Plaintiff and members of the Class and will likely retain the benefits of their

15   wrongdoing.

16   73.    Based on the foregoing allegations, Plaintiff's claims for relief include those set

17   forth below.

### COUNT I
### Violation of California's Unfair Competition Law ("UCL")
### Cal. Bus. & Prof. Code § 17200, *et seq.*

20   74.    Plaintiff re-alleges and incorporates by reference every allegation set forth in the

21   preceding paragraphs as though alleged in this Count.

22   75.    Plaintiff brings this claim individually and on behalf of the California Subclass

23   against Defendants.

24   76.    The UCL prohibits unfair competition in the form of "any unlawful, unfair, or

25   fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any

26   act."  Cal. Bus. & Prof. Code § 17200.  A practice is unfair if it (1) offends public policy; (2) is

27   immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers.

28   The UCL allows "a person who has suffered injury in fact and has lost money or property" to

1    prosecute a civil action for violation of the UCL. Cal. Bus. & Prof. Code § 17204. Such a person

2    may bring such an action on behalf of himself or herself and others similarly situated who are

3    affected by the unlawful and/or unfair business practice or act.

4         77.    As alleged below, Defendants have committed unlawful, fraudulent, and/or unfair

5    business practices under the UCL by: (a) representing that Defendants' Products have certain

6    characteristics that they do not, in violation of Cal. Civil Code § 1770(a)(5); (b) advertising goods

7    and services with the intent not to sell them as advertised, in violation of Cal. Civil Code §

8    1770(a)(9); (c) selling addictive substances to unsuspecting consumers and profiting from their

9    addiction; and (d) failing to disclose that their Products pose a serious risk of addiction.

10        78.    Defendants' conduct has the capacity to mislead a significant portion of the general

11   consuming public or of targeted consumers, acting reasonably in the circumstances.

12        79.    Defendants' conduct has injured Plaintiff and the California Subclass she seeks to

13   represent in that they paid money for a product that they would not have purchased or paid more

14   than they would have but for Defendants' failure to disclose the addictive nature of the Products.

15   Such injury is not outweighed by any countervailing benefits to consumers or competition. Indeed,

16   no benefit to consumers or competition results from Defendants' conduct. Since consumers

17   reasonably rely on Defendant's labels, and thus also its omissions, consumers could not have

18   reasonably avoided such injury. *Davis v. Ford Motor Credit Co.*, 179 Cal. App. 4th 581, 597-98

19   (2009); *see also Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 257 (2010)

20   (outlining the third test based on the definition of "unfair" in Section 5 of the FTC Act).

21        80.    Pursuant to California Business and Professional Code § 17203, Plaintiff and the

22   California Subclass members seek an order of this Court that includes, but is not limited to, an

23   order requiring Defendants to (a) provide restitution to Plaintiff and the other California Subclass

24   members; (b) disgorge all revenues obtained as a result of violations of the UCL; (c) pay Plaintiff

25   and the California Subclass members' attorneys' fees and costs; and (d) provide injunctive relief by

26   requiring Defendants to affix adequate warnings about the addictive nature of the Products on the

27   packaging.

28

81.     Here, equitable relief is appropriate because Plaintiff she may lack an adequate remedy at law if, for instance, damages resulting from her purchase of the Products is determined to be an amount less than the premium price of the Products.  Without compensation for the full premium price of the Products, Plaintiff would be left without the parity in purchasing power to which she is entitled.

<u>COUNT II</u>
**Violation of California's Legal Remedies Act ("CLRA")**
**Cal. Civ. Code § 1750, *et seq.***

82.     Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

83.     Plaintiff brings this claim individually and on behalf of the California Subclass against Defendants.

84.     Plaintiff and California Subclass Members are consumers within the meaning of California Civil Code § 1761(d).

85.     California Civil Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which she or she does not have."

86.     California Civil Code § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

87.     California Civil Code § 1770(a)(9) prohibits "advertising goods or services with intent not to sell them as advertised."

88.     Defendants violated California Civil. Code §§ 1770(a)(5), (a)(7), and (a)(9) by intentionally and misleadingly failing to disclose that the Products are addictive, a fact which is material to reasonable consumers such as Plaintiff and the California Subclass members.

89.     Defendants' misrepresentations and omissions deceive and have a tendency and ability to deceive the general public.

90.     Defendants have exclusive or superior knowledge of kratom's addictive nature, which was not known to Plaintiff or the California Subclass members.

91.     Plaintiff and California Subclass members have suffered harm as a result of these violations of the California Consumers Legal Remedies Act ("CLRA") because they have incurred charges and/or paid monies for the Products that they otherwise would not have incurred or paid had they known that kratom is addictive and causes withdrawals.  As a result, Plaintiff and the California Class are entitled to actual damages in an amount to be proven at trial, reasonable attorneys' fees and costs, declaratory relief, and punitive damages.

92.     In compliance with the provisions of California Civil Code § 1782, Plaintiff sent written notice to Defendants on February 28, 2025 and again on March 27, 2025, informing Defendants of her intention to seek damages under California Civil Code § 1750.  The letter was sent via certified mail, return receipt requested, advising Defendants that they were in violation of the CLRA and demanding that they cease and desist from such violations and make full restitution by refunding the monies received therefrom.  The letter expressly stated that it was sent on behalf of Plaintiff and "all other persons similarly situated."

## COUNT III
### Violation of California's False Advertising Law ("FAL")
### Cal. Bus. & Prof. Code § 17500, *et seq.*

93.     Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

94.     Plaintiff brings this claim individually and on behalf of the California Subclass against Defendants.

95.     Defendants' acts and practices, as described herein, have deceived and/or are likely to continue to deceive Class members and the public.  As described above, and throughout this Complaint, Defendants misrepresented that kratom is not addictive.  Such representation is not true.

96.     By its actions, Defendants disseminated uniform advertising regarding their kratom Products to and across California.  The advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of California's False Advertising Law (the "FAL").  Such advertisements were intended to and likely did deceive the consuming public for the reasons detailed herein.

97.     The above-described false, misleading, and deceptive advertising Defendants disseminated continues to have a likelihood to deceive in that Defendants continue to misrepresent, without qualification, that kratom is not addictive.

98.     In making and disseminating these statements, Defendants knew, or should have known, their advertisements were untrue and misleading in violation of California law. Defendants know that kratom is addictive yet fail to disclose this fact to consumers.

99.     Plaintiff and other California Subclass members purchased the Products based on Defendants' representations and omissions that kratom is not addictive. Once her addiction developed, Plaintiff felt she could not stop purchasing Defendants' Products despite her efforts to quit.

100.    The misrepresentations and non-disclosures by Defendants of the material facts described and detailed herein constitute false and misleading advertising and, therefore, constitutes a violation of the FAL.

101.    As a result of Defendants' wrongful conduct, Plaintiff and California Subclass members lost money in an amount to be proven at trial. Plaintiff and California Subclass members are therefore entitled to restitution as appropriate for this cause of action.

102.    Plaintiff and the California Subclass members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendants' unfair, unlawful, and fraudulent business practices; declaratory relief; reasonable attorneys' fees and costs; and other appropriate equitable relief.

## COUNT IV
### Breach of Implied Warranty

103.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

104.    Plaintiff brings this claim individually and on behalf of the Classes against Defendants.

105.    This claim is brought pursuant to the laws of the State of California.

106.    Defendants, as the designer, manufacturer, marketer, distributor, and/or seller of the Products, impliedly warranted that that kratom is not addictive and does not cause opioid-like withdrawal symptoms.

107.    Defendants breached this warranty implied in the contract for the sale of their kratom Products because the Products could not pass without objection in the trade under the contract description: the kratom Products were not adequately contained, packaged, and labeled as per Defendants' contract with Plaintiff and members of the Classes, and the Products do not conform to the implied affirmations of fact made on the marketing and packaging for the Products that the Products are not addictive and do not cause withdrawals. U.C.C. §§ 2-313(2)(a), (e), (f). As a result, Plaintiff and members of the Class did not receive the goods as impliedly warranted by Defendants to be merchantable.

108.    Plaintiff and members of the Classes purchased the Products in reliance upon Defendants' skill and judgment and the implied warranties of fitness for the purpose.

109.    The kratom Products were defective when they left the exclusive control of Defendants.

110.    Plaintiff and members of the Classes did not receive the goods as warranted.

111.    As a direct and proximate cause of Defendants' breach of the implied warranty, Plaintiff and members of the Classes have been injured and harmed because (a) they would not have purchased the Products on the same terms if they knew that the Products were addictive and could cause opioid-like withdrawal symptoms; and (b) the Products do not have the characteristics, uses, or benefits as promised by Defendants.

112.    On February 28, 2025, and again on March 27, 2025, prior to filing this action, Defendants were mailed pre-suit notice letters on behalf of Plaintiff that complied in all respects with U.C.C. §§ 2-314 and 2-607. Plaintiff's counsel sent Defendants a letter advising Defendants that they breached an implied warranty and demanded that Defendants cease and desist from such breaches and make full restitution by refunding the monies received therefrom.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT V
**Unjust Enrichment**

113.  Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

114.  Plaintiff brings this claim individually and on behalf of the Classes against Defendants.

115.  Plaintiff and the members of the Classes conferred a benefit on Defendants in the form of the gross revenues Defendants derived from the money they paid to Defendants.

116.  Defendants had an appreciation or knowledge of the benefit conferred by Plaintiff and the members of the Classes.

117.  Defendants have been unjustly enriched in retaining the revenues derived from Plaintiff and the Class members' purchases of the Products, which retention of such revenues under these circumstances is unjust and inequitable because Defendants omitted that the Products were addictive and similar to opioids.  This caused injuries to Plaintiff and members of the Classes because they would not have purchased the Products or would have paid less for them if the true facts concerning the Products had been known.

118.  Defendants accepted and retained the benefit in the amount of the gross revenues they derived from sales of the Products to Plaintiff and the members of the Classes.

119.  Defendants have thereby profited by retaining the benefit under circumstances which would make it unjust for Defendants to retain the benefit.

120.  Plaintiff and the members of the Classes are, therefore, entitled to restitution in the form of the revenues derived from Defendants' sale of the Products.

121.  As a direct and proximate result of Defendants' actions, Plaintiff and the members of the Classes have suffered in an amount to be proven at trial.

122.  Here, equitable relief is appropriate because Plaintiff may lack an adequate remedy at law if, for instance, damages resulting from her purchase of the Products is determined to be an amount less than the premium price of the Products.  Without compensation for the full premium price of the Products, Plaintiff would be left without the parity in purchasing power to which she is entitled.

123.    Restitution may also be more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price will ensure that Plaintiff is in the same place she would have been in had Defendants' wrongful conduct not occurred, i.e., in the position to make an informed decision about the purchase of the Products absent omissions with the full purchase price at her disposal.

<u>**COUNT VI**</u>
**Fraud by Omission**

124.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

125.    Plaintiff brings this claim individually and on behalf of the Classes against Defendants.

126.    Defendants distributed the Products throughout the United States, including the State of California.

127.    Defendants misrepresented that their kratom Products have attributes or qualities that they do not have by failing to disclose that kratom is addictive and can cause opioid-like withdrawal.

128.    Defendants know that kratom is addictive because they interact with kratom vendors, have been made aware of user reports, and have fully characterized kratom's alkaloids and created advanced extraction methods.

129.    Defendants know that knowledge of kratom's addictive nature is a material fact that would influence the purchasing decision of reasonable consumers.

130.    The average reasonable consumer in the kratom purchasing context does not know that kratom is addictive and cannot reasonably access that information.

131.    Defendants therefore had a duty to Plaintiff and the members of the Classes to disclose that kratom is addictive and can cause withdrawals on the Products' packaging.

132.    Consumers reasonably and justifiably relied on Defendants' omission because it is reasonable to assume that a product which is addictive like an opioid would bear some kind of a warning.

133.    As a result of Defendants' omission, Plaintiff and the members of the Classes paid for kratom Products they may not have purchased, or paid more for those Products than they would have had they known the truth about kratom.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Erin Jennings individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

a.    For an order certifying the Classes and naming Plaintiff as representative of the Classes and Plaintiff's attorneys as Class Counsel to represent the Classes;

b.    For an order declaring Defendants' conduct violates the statutes referenced herein;

c.    For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

d.    For actual, compensatory, statutory, and/or punitive damages in amounts to be determined by the Court and/or jury;

e.    For prejudgment interest on all amounts awarded;

f.    For an order of restitution and all other forms of equitable monetary relief;

g.    For injunctive relief as pleaded or as the Court may deem proper; and

h.    For an order awarding Plaintiff and the Classes their reasonable attorneys' fees, expenses, and costs of suit.

## **JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all claims so triable.

Dated:  June 25, 2025                          **BURSOR & FISHER, P.A**.

By: ___*/s/ Ryan B. Martin*_____
        Ryan B. Martin

Neal J. Deckant (State Bar No. 322946)
Luke Sironski-White (State Bar No. 348441)
Ryan B. Martin (State Bar No. 359876)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ndeckant@bursor.com
        lsironski@bursor.com
        rmartin@bursor.com

*Attorneys for Plaintiff*

**<u>CLRA VENUE DECLARATION</u>**

I, Ryan B. Martin, declare as follows:

1.      I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court.  I am an associate at Bursor & Fisher, P.A., counsel of record for Plaintiff. Plaintiff Jennings resides in Grass Valley, California.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.      The Complaint filed in this action is filed in the proper venue for trial under Civil Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in the Eastern District of California, as Plaintiff Jennings resides in this District and purchased the Products from a store in this District.  Additionally, Defendants advertise, market, manufacturers, sell, and distribute the Products at issue to Class Members in this District.

3.      I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct, and that this declaration was executed at Walnut Creek, California this, June 25, 2025.


                                            */s/ Ryan B. Martin*
                                            Ryan B. Martin